UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-81260-CIV-HURLEY

**CLAUDE DAVID CHASTAIN et al.,**
    **plaintiffs,**

vs.

**N. S. S. ACQUISITION CORP. d/b/a
BEV SMITH TOYOTA,**
    **defendant.**
_____/

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
& FINAL ORDER OF DISMISSAL WITH PREJUDICE

**THIS CAUSE** is before the court on the defendant's motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief may be granted. [DE# 12]. Having carefully considered the motion, together with plaintiff's response in opposition [DE# 15] and defendant's reply [DE# 18], the court has determined to grant the motion and dismiss this action with prejudice.

I. Background

On February 13, 2008, plaintiff Claude David Chastain ("Chastain") visited the defendant Bev Smith Toyota ("Bev Smith" or "the dealer"), an automobile dealership, to purchase a used car, a 2004 Mercury Grand Marquis. Chastain signed several documents in connection with the sale, including a credit application and a retail installment sale contract ("RISC"). [Complaint, ¶18].

On February 25, 2008, the dealer phoned Chastain to report that his financing application on the Marquis had been rejected. The dealer directed Chastain to return the vehicle and offered to sell him a different, cheaper automobile. Chastain returned the Marquis as requested and selected a used 2003 Buick Century to purchase in its stead. Chastain signed several documents

1

in connection with this sale, including a second RISC which identifies the dealer as "seller-creditor." [Complaint, ¶19]. This document, appended to the plaintiff's complaint, contains a "Seller's Right to Cancel" clause which provides in pertinent part:

> Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit, locate financing for you on the exact terms shown on the front of this contract, and assign this contract to a financial institution. You agree that Seller has the number of days stated on the front of this contract to assign this contract. You agree that if Seller is unable to assign this contract within this time period to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may cancel this contract.

[DE # 15-3]. Chastain also signed a document captioned "Bev Smith Buyer's Order for Motor Vehicle" and "Retail Buyer's Order" which, under "Notice of Conditional Sales Agreement" explicitly conditions the completion of the transaction upon the approval of financing by a third party financial institution:

> On a credit transaction the Buyer's offer is not accepted and the transaction is not consummated until (a) accepted in writing by an authorized dealer representative in the space indicated below, (b) Buyer and Dealer have signed a retail installment sales contract, (c) an assignment of the retail installment sales contract is accepted by a responsible Lender, and (d) Dealer receives (via facsimile, mail or electronic means) notice of Lender's unconditional acceptance of the assailment of the retail installment sales contract. This buyer order includes a Bailment Agreement.

The referenced "Bailment Agreement" provides that the vehicle remains the property of the dealer pending approval of third party financing or some other mode of payment in full:

> You understand that you have entered into a Conditional Sales Agreement, meaning the sale will not become firm until third-party lender has fully and finally approved you for the loan. "Final approval" and "finally approved" means that Dealer has received (via facsimile, mail or electronic means) notice of the lender's unconditional acceptance of the assignment of the retail installment sales contract. **Dealer is not a lender and does not lend money or accept monthly payments**.

> **You do not own the selected vehicle unless and until financing terms are fully and finally approved, or you either (a) pay cash for the vehicle or (b) obtain financing elsewhere**. Dealer is not agreeing to sell you the Selected Vehicle for the terms stated in this contract unless (a) a third party lender agrees to lend you the money at those same terms, or (b) you obtain financing elsewhere, or (c) you pay cash for the vehicle. **You acknowledge that any Retail Installment Sales Contract which identifies Dealer as "seller," "creditor," "lender" or "lessor" is meant solely for the purpose of assignment the contract to a lender**.

[DE# 12-2] [emphasis supplied]. This is commonly known in the industry as a "spot delivery" procedure. Under this system, the customer is presented with a purchase agreement, RISC, and bailment agreement, and the dealer then delivers the car to the customer "on the spot"-- i.e. the same date that the customer signs the documents -- allowing him or her to take possession of the vehicle without passage of title. *See e.g. Bragg v Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1063 (11th Cir. 2004). The customer, in return, typically makes a cash deposit or trades in an existing vehicle as a down payment. *Id.*

In line with this procedure, Chastain drove the Buick off Bev Smith's lot on the same day he executed the second RISC. He immediately thereafter relocated with his wife and two children to the State of Kentucky. However, his financing application on the Buick was subsequently rejected, prompting the dealer to recall the vehicle. According to Chastain, the dealer ultimately threatened to have Chastain arrested for theft, and, on March 28, 2008, repossessed the vehicle from him in Kentucky. [Complaint ¶21].

The complaint does not allege that Chastain paid any finance charges or other fees as a result of this transaction nor does he allege that he forfeited any down payment or trade-in vehicle. Plaintiff alleges solely that when the dealer repossessed the Buick, he was left stranded in Kentucky without family or friends to assist him. [Complaint ¶ 21].

On October 31, 2008, Chastain filed this lawsuit on his own behalf and on behalf of others similarly situated, charging the dealer with unfair credit and lending practices in violation of the Truth in Lending Act ("TILA")(Count 1), the Florida Motor Vehicle Retail Sales Finance Act ("MVRSFA")(Counts 2 and 3), the Equal Credit Opportunity Act ("ECOA")(Count 4) and the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") (Count 5).

## II. Standard of Review

Under Fed. R. Civ. P. 12(b)(6), a defendant may move for dismissal of a claim that fails to state a claim upon which relief may be granted. In determining a motion to dismiss, the court must accept all well pled facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Beck v Deloitte & Touche et al.,* 144 F.3d 732, 735 (11th Cir. 1998). At a minimum, the complaint must allege sufficient facts to "state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed.2d (2007). Although detailed factual allegations are not required, the plaintiff's pleading obligation requires more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action. The factual allegations must be enough to raise a right to relief above a speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact. *Id.*

In ruling on a motion to dismiss, the court is confined to the allegations contained within the four corners of the complaint. However, the court may consider a document attached to, or included by reference in, a dismissal motion without converting the motion into one for summary judgment if the document in question is (1) central to the plaintiff's claim and (2) undisputed, i.e. its authenticity is not challenged. *Maxcess, Inc. v Lucent Technologies, Inc.*, 433 F.3d 1337, 1349 (11th Cir. 2005); *Day v Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). In this case, the form "Bev

Smith Buyer's Order for Motor Vehicle" supplied by the defendant in support of its motion to dismiss [DE# 12-2] is central to the plaintiff's complaint, and its contents are not in dispute. Therefore, the court appropriately considers this document in determining the motion without the necessity of converting the motion into one for summary judgment. *See Day, supra* at 1276.

### III. Discussion

### A. TILA Claim

Congress enacted TILA to enhance economic stabilization and encourage competition between lenders. 15 U.S.C. §1601(a). In furtherance of this goal, TILA requires lenders make accurate and conspicuous disclosure of finance terms to consumers, "so that the consumer will be able to compare more readily the various terms available to him and avoid the uninformed use of credit." 15 U.S.C. §1601; 12 C.F. R. § 226.2(a)(13)(18). The stringent disclosure requirements are designed to prevent creditors from circumventing TILA's objectives by burying the cost of credit in the price of the goods sold. *Mourning v Family Publications Serv., Inc.*, 411 U.S. 356, 364, 93 S. Ct. 1652, 1658, 36 L. Ed.2d 318 (1973). The specific content and timing of the disclosures are set forth in Regulation Z, which was adopted by the Federal Reserve Board in support of TILA. 15 U.S.C. §1638(a); 12 C.F.R. § 226.1 *et seq.*

Both the Act and Regulation Z require that a creditor disclose the identity of the creditor, the amount being financed, the annual percentage rate, the total of payments and the total sale price. 15 U.S.C. §1638(a); 12 CFR § 226.18. The TILA requires that these disclosures be made "before the credit is extended," 15 U.S.C. § 1638(b), while Regulation Z provides "[t]he creditor shall make disclosures before consummation of the transaction." 12 C.F.R. §226.17(b). "Consummation" is defined as the time "the consumer becomes contractually obligated on a credit transaction."

12 C.F.R. §226.2(a)(13). In the context of a financing agreement where the condition of obtaining financing is within the exclusive control of the seller and third-party lender, "consummation" occurs at the point where the consumer signs the contract and becomes contractually obligated to the purchase of credit. *See Bragg v Bill Heard Chevrolet, Inc.,* 374 F.3d 1060 (11th Cir. 2004).

In this case, plaintiff claims that the dealer violated TILA's content and timing requirements by presenting the terms and conditions of the transaction and pending loan as a conditional sale, thereby rendering all terms set forth in the RISC illusory. That is, because the purchase was contingent on plaintiff's ability to secure financing, plaintiff claims that the essential terms of the contract were not completed at the time he signed the RISC, rendering the contract "fictitious and illusory," leaving the consumer with "the Hobson's choice of signing a second contract[1] or losing the new vehicle," all based on the "unverifiable excuse" that "the Bank rejected your credit." [Complaint ¶ 13].

However, there is nothing in TILA or Regulation Z which prohibits financing contingencies in consumer contracts as violative of the TILA, nor does plaintiff identify any controlling case authority suggesting that the inclusion of a "financing contingency" in this context renders TILA disclosures "illusory," "contradictory" or "meaningless." To the contrary, the Eleventh Circuit has acknowledged the validity of a financing contingency as a "condition precedent" in the TILA context. *See Bragg v Bill Heard Chevrolet, Inc., supra* at 1067. Other courts addressing the more specific issue raised here have held that accurate disclosures do not become TILA violations because they are rendered moot due to subsequent failure of financing.

---

[1] Notably, Chastain does not allege that his signature on the second contract resulted in any economic damages to him, either in the form of increased interest or finance charges, lost down payment or trade-in vehicle.

*See e.g. Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765 (7th Cir. 2000); *Leguillou v Lynch Ford, Inc.*, 2000 WL 198796 at **3-4 (N.D. Ill. 2000)("If information disclosed in accordance with [TILA] is subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part," citing 15 U.S.C. §1634); *Hunter v. Bev Smith Ford, LLC,* 2008 WL 1925265, *3-4 (S.D. Fla. 2008).

In this case, the parties entered into a conditional contract, which is permitted under Florida law.[2] All of the TILA disclosures were accurate when Chastain signed that contract. When he left the dealership with the Buick, he had a right to possession of the automobile under the parties' "bailment agreement," but would not become the owner unless and until third party financing was approved or he otherwise paid for the car. Since the condition precedent (third party financing) never occurred, he did not become the owner and the dealer's TILA disclosures were only rendered inaccurate by its subsequent failure to obtain approval of third party financing. This sequence of events does not state a claim for violation of the TILA. 15 U.S.C. §1634; *Scroggins v LTD, Inc.*, 251 F. Supp. 2d 1277 (E.D. Va. 2003)(TILA requires that disclosures be accurate at the

---

[2] Florida law permits parties to condition formation of a contract on the occurrence of an event such as third party financing. *See Bragg v Bill Heard Chevrolet,* 374 F.3d 1060 (11th Cir. 2004), citing *Huskamp Motor Co. v Hebden,* 104 So.2d 96, 98 (Fla. 3d DCA 1958) and *777 Flagler Co. v Amerifirst Bank*, 559 So.2d 1210, 1211 (Fla. 4th DCA 1990). *See also King v King Motor Co. of Fort Lauderdale, Inc.*, 900 So.2d 619, 623 (Fla. 4th DCA 2005)(noting that Florida statutes contemplate use of conditional sales contracts in motor vehicle sales industry); *Dodge City, Inc. v Byrne*, 693 So.2d 1033, 1035 (Fla. 2d DCA 1997)(where buyers simultaneously executed several documents including multiple RISCs, court concluded "[w]hen the contracts are read together, it is clear that the buyers agreed to return the vehicle to Dodge City if the dealership could not find financing with an outside lender").

time of consummation; no TILA claim stated where subsequent failure to obtain financing rendered disclosures inaccurate). The court shall accordingly dismiss the plaintiff's TILA claim with prejudice.

### B. MVRSFA Claims (Counts 2 and 3)

In Count 2, plaintiff alleges that the Dealer violated §§520.07 (1)(a) of the Florida Motor Vehicle Retail Sales Finance Act (MVRSFA), which require a RISC to be in writing, signed by both buyer and seller and "complete as to all essential provisions prior to the signing of the contract by the buyer." In this connection, Chastain alleges that the RISC is not complete as to all "essential provisions" because the conditional nature of the agreement effectively erases the contract terms, making the disclosures "incomplete and entirely illusory" at the time of signing. [Complaint ¶39]. Thus, Chastain does not identify any single missing "essential provision," but, tracking his TILA claim, simply asserts that all terms are "illusory" because of the conditional nature of the financing agreement.

Florida law provides that a contract which complies with the federal TILA also complies with the Florida MVRSFA, provided the contract also contains a separate written itemization of financing as explained in Fla Stat. § 520.07(2). The RISC at issue in this case contains such an itemization of amount financed in compliance with MVRSFA. Since there is no TILA violation here, as discussed *supra*, the plaintiff's MVRSFA claim under § 520.07, Fla. Stat. (2007) necessarily fails to state a claim upon which relief may be granted. The court shall accordingly dismiss Count 2 of the plaintiff's complaint with prejudice.

In Count 3, plaintiff alleges that the RISC financing contingency is tantamount to a violation of §520.13, Fla. Stat. (2007), which essentially states that to the extent a seller attempts

8

to waive any provisions of the MVRSFA, those waiver provisions are unenforceable and void. Plaintiff's theory here is that the RISC financing contingency has the effect of allowing the dealer to unilaterally change the terms of the disclosures on the RISC "as if they did not exist," thereby violating TILA, the MVRSFA and the RISC itself . [Complaint, ¶43].

However, the plain terms of the RISC attached to plaintiff's complaint contradict this allegation of waiver. In this situation, where the allegations of a complaint are contradicted by specific facts revealed by an attached exhibit, the plain language of the exhibit will control and the conclusory allegations of complaint are not admitted as true. *Flint v ABB, Inc.*, 229 F. Supp. 2d 1338 (S.D. Fla. 2002)(citing *Associated Builders, Inc. v Alabama Power Co.,*. 505 F.2d 97 (5th Cir. 1974), *aff'd* 337 F.3d 1326 (11th Cir. 2003), *cert. den.*, 540 U.S. 1219, 124 S. Ct. 1507, 158 L.Ed.2d 153 (2004). Thus, as a matter of law, the court finds no "waiver" of any provision of the Florida MVRSFA of the genre contemplated by § 520.13. The court shall accordingly dismiss Count 3 with prejudice for failure to state a claim.

Alternatively, the court finds that plaintiff states no cognizable claim for damages in Count 3, where he demands refund of finance charges pursuant to §520.12(2), Fla. Stat. (2007). Plaintiff does not, however, allege that the dealer ever charged him with any finance charge or other fee. Plaintiff thus alleges no cognizable damages under § 520.13 of the Florida MVRSFA. The defendant's motion to dismiss Count 3 is appropriately granted upon this additional and alternative basis. *See Jones v TT of Longwood, Inc.* , 2007 WL 2298020 (M.D. Fla. 2007)(summary judgment entered for defendant on §§ 520.07 and 520.12 claims where plaintiff was never assessed a finance charge or fee and down payment was returned in full).

### C. ECOA Claim

*Congress enacted the ECOA to protect consumers from credit denials for discriminatory* reasons such as the consumer's age, race, religion, national origin, gender, marital status and source of income. 15 U.S.C. §1691(a). The ECOA requires a creditor to notify an applicant for credit of its action on the application, and if the action is adverse, the creditor must provide the applicant with a written statement of reasons or provide written notification with disclosure of the applicant's right to a written statement of reasons. 15 U.S.C. §1691(d). The ECOA allows an aggrieved applicant to bring a civil action against "any creditor who fails to comply with any requirement imposed under this subchapter." 15 U. S. C. § 1691e.

The ECOA defines the term "creditor" as "any person who regularly extends, renews or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew or continue credit." 15 U.S.C. §1691a(e). The term "creditor" is also defined by Regulation B:

> Creditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee or subrogee who so participates. For purposes of § 202.4 (a) and (b), the term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made. A person is not a creditor regarding any violation of the Act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction. The term does not include a person whose only participation in a credit transaction involves honoring a credit card.

12 C.F.R. §202.2.

Here, plaintiff alleges that Bev Smith Toyota is a "creditor" within the meaning of this statute because it "regularly purports to extend credit (as evidenced by the RISCs) and when credit

is denied or revoked it is Dealer who makes that decision." [Complaint, ¶ 51].

The RISC attached to the plaintiff's complaint acknowledges seller's authority to assign the contract to one of the financial institutions with whom it regularly does business, and the simultaneously executed Retail Buyer's Order clearly states under "Bailment Agreement" that "Dealer is not a lender and does not lend money or accept monthly payments...... You acknowledge that any retail installment sales contract which identifies dealer as "seller," "creditor," "lender" or "lessor" is meant solely for the purpose of assignment the contract to a lender."  Taken together, these documents demonstrate that the dealer regularly refers credit applicants to creditors or lenders, and selects creditors to whom such credit application can be made, but does not "regularly participate[] in the credit decision."

Where an automobile dealer plays a limited role of accepting and referring applications for credit, without participation in the credit decision, the dealer is deemed a "creditor" within the meaning of the ECOA only for purposes of compliance with 12 C.F.R. §202.4(a) (anti-discrimination) and § 202.4(b) (anti-discouragement).  *See Treadway v Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 979 (7th Cir. 2004).  It is not charged with the separate duty of reporting a written statement of reasons for adverse credit action to the applicant under 15 U.S.C. § 1691(d).

As the Seventh Circuit explained in *Treadway, supra,* in the "common scenario" in which an automobile dealership decides to send a credit application to a limited number of lenders with which it works, "the Federal Reserve Board has clearly indicated that merely "selecting creditors to whom applications will be made" does not make one a "creditor" for purposes of the notice requirements of the ECOA [§1691(d)]." *Id.* at n. 8, citing 68 Fed. Reg. 13155.  In this situation,

11

where at least one lender is given the opportunity to decide whether to extend credit, it is the lender, rather than the dealer, that makes the credit decision, and there is another party that can provide notice to the applicant. *Id.*

Accordingly, the court shall dismiss the plaintiff's ECOA claim (Count 4) with prejudice for failure to state a claim upon which relief may be granted.

### D. FDUPTA Claim

The Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") proscribes any unfair or deceptive act or practice committed in the conduct of any trade or commerce. §501.204(1), Fla. Stat. (2007). Any person suffering a loss a result of a violation of this statute has a private cause of action for actual damages, attorney's fees and costs. §501.211, Fla. Stat. (2007).

This law is intended to give Florida consumers a simplified statutory cause of action that provides additional substantive remedies and permits recovery of economic damages related to a product or service purchased in a consumer transaction involving unfair or deceptive practices or acts. *Jones of TT of Longwood, Inc., supra*, citing *Delgado v J.W. Courtesy Pontiac GMC Truck, Inc.*, 693 So.2d 602, 606 (Fla. 2d DCA 1997). The Florida Supreme Court has emphasized that the remedies of the FDUTPA "are in addition" to other remedies available under state or local law. *Pinellas County Dept. of Consumer Affairs v Castle*, 392 So.2d 1292, 1293 (Fla. 1980). A practice is unfair under the FDUTPA if it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Suris v Gilmore Liquidating, Inc.*, 651 So.2d 1282, 1283 (Fla. 3d DCA 1995).

In this case, plaintiff seems to suggest that the dealer's sales practices are misleading, unfair or unconscionable because the RISC names the dealer as "seller- creditor," while other documents signed at the same time purport to relieve it of its status as lender, effectively allowing it to make an "end run" around TILA and Regulation Z disclosure requirements and unilaterally withdraw from the contract at its whim.[3]

Although the RISC does identify the dealer as the "Seller-Creditor," it also clearly states that the seller may assign the contract to a third party financial institution. Under the "Right to Cancel" clause, Buyer acknowledges that "it may take a few days for Seller to verify [buyer's] credit, locate financing for [buyer] on the exact terms shown on the front of this contract, and assign this contract to a financial institution with whom [seller] regularly does business," and that "if Seller is unable to assign this contract within [the time period stated on the front of the contract] to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may cancel this contract."

Further, the Retail Buyer's Order, signed at the same time as the RISC, plainly states "Dealer is not a lender and does not lend money or accept monthly payments ..... You acknowledge that any retail installment sales contract which identifies dealer as "seller," "creditor," "lender" or "lessor" is meant solely for the purpose of assignment the contract to a lender."

---

[3] While the plaintiff further complains that the dealer uses these printed disclaimers to perpetrate "intentional fraud" by luring rejected buyers back to the dealership to sign second RISCs more profitable to the defendant in a classic "bait and switch" technique (Response in Opposition at pp. 6-7), in Chastain's case there is no allegation that the dealer profited or even attempted to usurp superior profit under the second RISC (i.e. no allegation Chastain was asked to sign a second RISC imposing a higher interest rate than the first, or that he encumbered or lost a trade-in vehicle by returning to negotiate a new deal after the first financing application fell through).

13

Read together, *see e.g. Quix Snaxx, Inc. v Sorensen*, 710 So.2d 152, 153 (Fla. 3d DCA 1998), the RISC and Buyer's Order (containing the relevant "bailment agreement") make clear that third party financing was contemplated by both parties, and that dealer was not intended to act as lender for the transaction in question.

On this background, the court concludes, as a matter of law, that the complaint fails to describe any acts or practices with respect to the Chastain transaction which are unfair, immoral, unethical, oppressive, unscrupulous, or otherwise offensive to public policy for purposes of stating a potential FDUPTA claim. *See Jones v TT of Longwood, supra*. The plaintiff's FDUPTA claim (Count 5) shall accordingly be dismissed with prejudice.

### IV. Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. The defendant's motion to dismiss [DE# 12] is **GRANTED.**

2. This action is **DISMISSED WITH PREJUDICE** in its entirety pursuant to Fed. R. Civ. 12(b)(6) for failure to state a claim upon which relief may be granted.

3. There being nothing further for the court to do, the Clerk of Court is directed to **CLOSE** this file and terminate any pending motions as **MOOT.**

**DONE AND ORDERED** in West Palm Beach, Florida this 8th day of July, 2009.

_____
Daniel T. K. Hurley
United States District Judge

cc. All counsel